UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

ALTHEA DAVIS AND RONALD DAVIS                    PLAINTIFFS

VS.                                 CIVIL ACTION NO. 3:02CV271LN

FORD MOTOR COMPANY                               DEFENDANT

MEMORANDUM OPINION AND ORDER

There are pending before the court in this cause a motion by plaintiffs Althea Davis and Ronald Davis for additur, or in the alternative, for a new trial on damages only pursuant to Rule 59 of the Federal Rules of Civil Procedure, and a motion by defendant Ford Motor Company for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.  For reasons set forth herein, the court concludes that defendant's motion should be granted.

Plaintiffs filed this lawsuit against Ford Motor Company seeking to recover damages for personal injuries sustained by Althea Davis in an automobile accident which resulted when the Ford Explorer she was driving rolled over, throwing her from the vehicle.  Plaintiffs alleged that the Explorer was defective in that it had an unreasonable propensity to roll over on flat, dry pavement, and that this defect caused the accident at issue in this lawsuit.

Following a seven-day trial, the jury returned a verdict on special interrogatories in which they purported to find that the vehicle was defective and that the defect caused or contributed to the subject accident.  However, as to the elements of damages concerning which the jury was instructed, the jury found only $10,800 in medical expenses, despite indisputable and undisputed evidence (as evidenced by the parties' stipulation) that medical expenses incurred for injuries sustained by Ms. Davis in the accident totaled $54,000,000.  The jury found she was entitled to "-0-" for bodily injury and pain and suffering, despite it being manifest that Ms. Davis did suffer bodily injury and physical pain from her injuries.[1]  The jury then "wrote in" on the verdict form an element of damages about which they were never instructed:

    e.  Ford pays for all attorney and all court costs for
        both plaintiff & defendent (sic).

In the wake of the unusual jury verdict, the court solicited briefs from the parties stating their positions as to validity and/or proper interpretation of the verdict.  Ford responded by filing its "Recommendation as to the Jury Verdict," in which it took the position that the verdict in general is valid as a

---

[1]     The jury also made no award for lost wages or for Mr. Davis's loss of consortium; the evidence on these aspects of her claimed damages was disputed such that the jury could reasonably have found no loss of earnings or impairment of earning capacity and no loss of consortium.

2

verdict (subject to challenge under Rule 50), with the exception that the additional element of damage written in by the jury is due to be stricken as surplusage since the court did not instruct the jury on the award of costs and attorneys' fees and because the plaintiffs did not seek or request such damages at trial or in jury instructions. See Great Pines Water Co., Inc. v. Liqui-Box Corp., 203 F.3d 920, 924 (5th Cir. 2000) (stating that "[f]ederal courts have long held that additional jury notations that are not directly responsive to the jury charge and verdict form are surplusage, and are to be ignored").

For their part, plaintiffs responded to the jury verdict with a motion for additur or, in the alternative, for a new trial on the issue of damages only. Therein, they argue that the jury's verdict in their favor on the issue of liability is proper and valid, but that the damages which the jury purported to award are inconsistent with their other findings and inadequate as a matter of law, suggesting that the award was the result of bias, passion and prejudice and against the overwhelming weight of the evidence.

Defendant then filed its renewed motion for judgment as a matter of law pursuant to Rule 50, contending there is insufficient competent evidence to support the jury's verdict as to liability. The court, having considered the parties' arguments and the evidence adduced at trial, concludes that there is a lack of substantial evidence to support the jury's verdict as to

3

liability (assuming, that is, that the jury actually intended a verdict as to liability), and that accordingly, defendant is entitled to judgment as a matter of law.  Given this conclusion, the court need not further consider whether the jury's verdict is otherwise infirm on the basis of its unsupportable and irregular damages award.[2]

Federal Rule of Civil Procedure 50 states, in pertinent part,

(a) Judgment as a Matter of Law.
(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
. . .
(b) Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.  If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-- and may alternatively request a new trial or join a motion for a new trial under Rule 59.  In ruling on a renewed motion, the court may:
(1) if a verdict was returned:

---

[2]     Given the jury's verdict with respect to damages, one could reasonably question the validity of the verdict as to liability.  If, then, the court had been inclined merely to grant a new trial, it would have done so as to both liability and damages, and not merely damages alone.  However, for purposes of addressing Ford's motion for judgment as a matter of law, the court has assumed a valid jury verdict as to liability.

```
        (A) allow the judgment to stand,
        (B) order a new trial, or
        (C) direct entry of judgment as a matter of law; or
   (2) if no verdict was returned;
        (A) order a new trial, or
        (B) direct entry of judgment as a matter of law.
```

Pursuant to the rule "[j]udgment as a matter of law is appropriate only if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for' the non-movant." <u>Butler v. MBNA Technology, Inc.</u>, 111 Fed. Appx. 230, 232, 2004 WL 2244203, at 1 (5th Cir .2004) (quoting Fed. R. Civ. P. 50(a)).  The court's charge is to review the jury's verdict "only to determine whether it is 'supported by substantial evidence.'" <u>Id</u>. (quoting <u>Snyder v. Trepagnier</u>, 142 F.3d 791, 795 (5th Cir. 1998)). "'Substantial evidence' is evidence 'of such weight and quality that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions.' <u>Id.</u> (quoting <u>Snyder</u>). The question for the court, then, is whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." <u>American Home Assur. Co. v. United Space Alliance, LLC</u>, 378 F.3d 482, 486-87 (5th Cir. 2004) (citing <u>Liberty Mut. Ins. Co. v. Falgoust</u>, 386 F.2d 248, 253 (5th Cir. 1967)).  Of course, in evaluating this question, the court must bear in mind that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those

of a judge." <u>DP Solutions, Inc. v. Rollins, Inc.</u>, 353 F.3d 421, 427 (5th Cir. 2003) (citations omitted).

Turning, then, to the case at bar, as to the issue of liability, plaintiffs' case was grounded entirely on the testimony of their two expert witnesses, the first, their accident reconstructionist, James Hannah, and the second, their design expert, James Medcalf.  If the testimony of these experts is not adequately supported, it follows that their testimony cannot constitute the "substantial" evidence needed to support a jury verdict.  <u>See</u> <u>Guile v. U.S.</u>, 422 F.3d 221, 227 (5th Cir. 2005) ("We must remember . . . that evidence sufficient to support a jury verdict must be <u>substantial</u> evidence.  An expert's opinion must be supported to provide substantial evidence. . . ") (citations omitted); <u>Viterbo v. Dow Chem. Co.</u>, 826 F.2d 420, 422 (5th Cir. 1987) (stating that "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury").    Both Medcalf, plaintiffs' design expert, and Hannah, their accident reconstructionist, were allowed to testify at trial over the objection of defendant that neither was able to offer reliable expert opinion testimony in accordance with Federal Rule of Evidence 702 and the test provided by <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).  Defendant, in fact, had moved in limine to exclude the testimony of both these experts.  Although the court

recognized these as serious motions, the court lacked sufficient time in advance of trial to conduct a <u>Daubert</u> hearing, and thus, with the understanding that Medcalf's testimony, in particular, was essential to plaintiffs' case, and with the understanding–or perhaps misunderstanding–that Hannah's testimony was not viewed as particularly harmful to or by defendant, the court allowed the testimony of the witnesses to be presented at trial, subject to the court's evaluating the reliability of their testimony as it was presented at the trial itself.[3]  In effect, then, and explicitly so as to Medcalf, the court reserved ruling on defendant's <u>Daubert</u> challenge to plaintiffs' experts.

In general, Medcalf testified that the 2000 model Explorer is defective because, owing to its low "dynamic stability factor," it has an unreasonable tendency to roll over on flat, dry pavement. In its motion, Ford challenges the sufficiency of Medcalf's testimony to sustain plaintiffs' burden to establish liability. Specifically, it argues that Medcalf's dynamic stability factor, which is the foundation of his "generic defect opinion," has never been adopted or peer reviewed by the engineering community, and is untested, specifically as to the subject Explorer model, so that consequently, his defect opinions are ultimately unreliable and

---

[3]   That is, it was apparent that granting defendant's <u>Daubert</u> motion, at least as to Medcalf, would be tantamount to granting summary judgment for the defendant.

hence cannot provide the substantial evidence needed to support plaintiffs' case.  Ford submits, moreover, that even if there were arguable scientific/engineering support for Medcalf's generic defect theory, he has not shown that his theory has any causal relevance to this particular accident.  Finally, and in a related vein, Ford argues that Medcalf (and hence plaintiffs) failed to present a specific feasible design alternative which would not have rolled over under the specific facts and circumstances of the Davis accident.

Given the nature of the defect claimed by Medcalf, i.e., the Explorer's tendency to roll over on flat, dry pavement, it follows that if, as contended by Ford, the Davis vehicle rolled over in the median, rather than on the roadway, the defect identified by Medcalf could not have caused or contributed to the subject accident.  Consequently, a critical issue in this case was whether the Davis vehicle rolled over, or at least began to roll over, on the pavement, or whether it instead rolled over in the grassy median.  Medcalf confirmed in his testimony that his opinion on causation was grounded entirely on the premise that the Davis vehicle began to roll over on the roadway, i.e., that this accident was an "on-road friction trip."  Along these lines, he stated:

> I started with the need to know where -- did it most
> likely roll over on flat pavement or was it a result of
> an impact strike.  You can roll over lots of vehicles,
> including some that you wouldn't think you could roll

> over if you do an impact strike, what's called a curb
> trip or a physical trip, as opposed to being rolled over
> as a result of friction.

Medcalf further testified that after reviewing the evidence,
including witness statements, James Hannah's report and a
videotape of the accident scene taken for a local television
station's news report, along with photo images pulled from that
video, it appeared to him that there was "only one tire dragging
in the grass -- as [the vehicle went] into the grass." Medcalf
thus concluded: "If that's true, then the vehicle had to have
the other tires either off the ground or so unloaded that it was
in the process of rolling over."

Hannah, to whom Medcalf deferred as to the circumstances of
the accident, similarly offered his opinion that the vehicle was
"going towards airborne" as it left the pavement. Hannah stated:

> [T]his roll initiated and was beginning right at the
> edge of pavement. That's where the roll was beginning.
> The vehicle actually had no evidence of all four tires
> on the road, on the ground, so with that evidence not
> being there, that would indicate that one of them was
> off the ground and the other two were faint. That would
> indicate to me they were beginning to go airborne.

It is clear to the court, however, that the physical evidence, as
well as testimony of eyewitnesses, overwhelmingly belies Hannah's
and Medcalf's conclusion as to how this accident likely occurred,
that is, their conclusion that the rollover began on or at the
edge of the roadway. The evidence, instead, is decidedly to the
effect that the vehicle was on all four tires as it left the

roadway and entered the median, and remained on the ground well into the median, with the rollover commencing near the center of the grassy median and not on dry pavement, as theorized by Medcalf. From this, it follows that Medcalf has failed to show that the defect he purports to have identified in the subject Explorer caused or contributed to the accident. Ford is therefore entitled to judgment as a matter of law.

Two eyewitnesses to the accident testified unequivocally that the rollover occurred only after the vehicle had left the highway and traveled well into the median. Melissa Callaway, who was a few cars behind the Davis vehicle when the accident occurred, testified that the Davis vehicle started flipping only after it was "going down in the median." Ms. Callaway stated:

> A.  It didn't roll until it was in the grass.
> Q.  All right.  Was it down in the median?
> A.  Well, it had to be down, because as I passed, she was going down and then I looked back in my rearview mirror, so she had to be rolling as she got down in the grass.
> Q.  All right.  Now you said in your deposition that she hit a dip.  What did you mean by that?
> A.  On that area, the median goes down, so I just called it a dip.  I didn't know what else to –
> . . .
> Q.  Is there any doubt in your mind that the vehicle of Ms. Davis rolled in the middle of the median?
> A.  She did not roll until she got down in the grass down in the median at some point.

Ms. Callaway maintained this position throughout her testimony:

> A.  I saw the vehicle go down in the median and then it started flipping as I passed it and saw it in the rearview mirror.
> . . .

> A. [A]s I'm behind her, several car lengths behind, and
> she's coming down in the median, and she's already down
> in the median to some extent when I pass before she
> starts flipping, because I don't see her flip until I'm
> passed her in my rearview mirror.
> . . .

Ms. Callaway also testified that the vehicle <u>was on all four</u>

<u>wheels in the median</u>:

> A. . . . I'm saying she was already down in the grass,
> still on the four wheels, before I passed her.
> . . .
> A. . . . [S]he was in the median before she started
> flipping down in the grass.  She was already down in the
> grass.  I passed, and then she got down into that dip
> area and started flipping. . . .

Scott Bivings, another witness, similarly testified that he

saw the vehicle roll over "in the median."  Bivings testified that

after Ms. Davis initially moved to the left to avoid another car

and then back to the right, the Explorer swayed four or five times

and then took a "big left," leaving the highway and heading into

the median at a near ninety degree angle, or almost perpendicular

to the highway.  Bivings stated:

> A.  It got toward the end, and I remember thinking to
> myself that it was headed over into the southbound lane
> or traffic, and then it commenced to rolling.
> Q.  At the time you saw it, was it still on all four
> wheels.
> A.  Yes, sir.
> . . .
> Q.  Now, Mr. Bivings, at the time that you saw this
> vehicle when it was at approximately 90 degrees angle,
> it was off the road entirely.  Is that correct?
> A.  Yes, sir.
> Q.  It had not rolled on 220.  Is that correct?
> A.  Yes.
> Q.  And it was traveling in the median at that time?
> A.  Yes.

. . .
Q.  Mr. Bivings, you said you saw all four tires on the
ground when it came off the roadway. . . .  Are you sure
all four tires were on the ground or was it possible
they could have already been lifted?
A.  The vehicle was in the median bouncing up and down,
you known, traveling through the median.  So as far as
if the tires left the road – if the tires left the dirt
or not – I didn't notice them leaving the median
surface.
. . .
A.  In the median I didn't notice the tires coming up
one way of another until – because I remember thinking
it's headed for that other lane of traffic, and then
when it that was – I never got any indication that it
was fixing to roll over – about to roll.  In fact, I
thought it was slowing down and at the very last thing
it does.
Q.  So it did eventually roll?
A.  Yes.
Q.  So the tires did eventually lift?
A.  Yes, But I didn't really focus my attention on that
because when I saw them slowing down, I started pulling
off the side of the road.

Mr. Bivings did testify that he did not know where the

vehicle started to roll; he "guess[ed] that it started [to roll] .

. . where the debris was," i.e., near the center of the median,

but he admitted that he "never actually saw" where it started to

roll.  It was clear, though, that Bivings, like Callaway,

perceived that the vehicle was on four wheels as it started across

the median, and began to roll at some point in the median.[4]

Other witnesses as to the scene immediately following the

accident described conditions that were completely inconsistent

_____

[4]     At trial, the only other witness to the accident itself,
Lisetta Johnson, testified that she did not see where the vehicle
left the roadway or when it started to flip.

with the suggestion that the rollover commenced on or at the edge of the roadway.  Charles Gary Chides, a paramedic who responded to the accident, testified that after rendering medical assistance to the victims, he went back to look around because he was curious to know why the car had wrecked.  He testified that he walked from the vehicle up to 220 on the northbound lane, and was "looking at the tracks" and saw that

> [t]here was grass peeled up where the two tire marks
> come down.  It went all the way to this ditch right
> here.  There's a ditch in this area where the darkness
> is (at the base of the median).  There was tire marks up
> to that ditch.  I went up here, and I just noticed that
> so I pushed those grass things down.
> Q. And you were walking in the same direction as the tracks?
> A.  Up the hill.
> Q.  And when you got right here to the bottom of the ditch,
> would the divot have been right in front of the concrete
> culvert?
> A.  A few feet.
> . . .
> A. . . . I walked from the grass up and looked at the tracks.
> . . .
> Q.  Could you tell if the tracks were fresh?
> A.  Yes, sir, you could follow them right to the ditch
> where the car was.
> Q.  Was there – could you tell that they came from this
> crash?
> A.  Yes.
> Q.  Were they continuous from the bottom of the ditch
> all the way up to the roadway?
> A.  From the road down to the ditch, you could see the
> tracks all the way down to the ditch.
> Q.  And how many tracks were there?
> A.  Two.

Another witness to the scene following the accident was Barbie Bassett, a meteorologist who reported on the accident for the local television station's news report from the station's

traffic helicopter.  In addition to providing testimony as to what she saw on the day of the accident, Ms. Bassett provided the videotape of the scene as taken from the helicopter, the original of which is undeniably the best evidence of the accident scene. Ms. Bassett testified that from her vantage point in the helicopter, both with her naked eye and from the video monitor in the helicopter (which was able to zoom in on the scene), she was clearly able to see the path the Davis vehicle traveled down into the median, and she had no doubt that there were two clear tire tracks leading from the highway all the way down into the median. She testified as follows:

> Q.  Barbie, do you have a current recollection of having seen those tire marks exiting the roadway coming all the way . . . down . . . to the bottom of the median. . .
> A.  Absolutely, yes.

She also confirmed the presence of two distinct tire tracks by reference to the videotape and still photographs taken from the video which came "right off the interstate" and "extended all the way down to what I would call the ditch or the trench area."  She continued, stating,

> [I]t was so evident for me to be able to see it, even at 800 feet, because the day before on May 3rd, we received .60-inches of rain, which means the ground was still saturated, still moist.  So you would be able to see any type of trench mark, especially that deep from that high.  Normally if we've had a dry day, I probably wouldn't be able to see that, but I was able to see that very clearly and very easily.

14

She further testified that it looked to her

> as if maybe the vehicle started going in at the side and
> then, of course, hit this dip or this trench and then at
> that point tripped and turned over.

And she stated,

> I grew up on a farm and this reminds me of disking,
> plowing, and how the dirt is extremely disturbed once
> that disk and that plow goes over the ground, and that's
> exactly what you see right here all the way down [to the
> bottom of the ditch].

Ms. Bassett was wholly unequivocal in her testimony:

> Q.  Barbie, number one, were those marks such that from
> 800 feet you could still see how dark they were in the
> earth?
> A.  Yes, because they were so deep.  That's why I was
> able to see them at 800 feet is because they were so
> deep.  There is so much mud there.

When shown the videotape, frame by frame, she repeated that she

could see the tire marks, where they go off the road, all the way

to the bottom of the ditch, and where they stopped at the bottom.

Finally, she was asked:

> Q. Lastly, is there any doubt in your mind, Barbie, that
> the tire marks that you saw left the roadway and went
> all the way down and stopped at the bottom of the
> median?
> A.  No doubt at all.  It's so clear, so obvious for me to
> see.

On cross examination, plaintiff's counsel questioned Ms. Bassett

thoroughly concerning her testimony, and suggested to her that if

there was a second tire mark, it was very difficult to see.  Ms.

Bassett disagreed, and maintained that she could clearly see two

marks coming immediately off the interstate.  She stated:

15

> A. . . . [I]t's very obvious for me to see two lines
> coming – two track marks coming directly off the
> interstate, very clear.

From a review of this testimony, it is hardly the case that there was, as Hannah put it, "no evidence" that all four tires remained on the ground as the vehicle entered the median.  Hannah insisted, though, that he based his conclusion on the facts as gleaned from the physical evidence, rather than relying on the testimony of witnesses, whose perceptions may not always be true to the facts as they actually exist.  Here, however, the physical evidence relied on by Hannah, and by Medcalf, is wholly insubstantial and insufficient to support their conclusion or to sustain the plaintiffs' case.

Hannah was hired by plaintiffs three years after the accident.  He initially provided an opinion to plaintiffs' counsel in September 2003, in which he opined that the accident was the a result of the well-known propensity of Ford Explorers to roll over.  Specifically, he reported:

> The physical evidence and the photographs appear to show
> a classic example of the consequences of the Ford
> Explorer, which is relatively narrow and tall and
> difficult to control in emergency situations.
> ...
> It is my opinion that this accident was caused by the
> Ford Explorer which has a demonstrated history of
> rollover issues associated with it.  For Explorers have
> a well-documented history of rollovers resulting in
> fatal accidents.

Manifestly, however, that opinion cannot reasonably be found to have been based on the results of his purported reconstructing of

16

the accident.  Hannah testified at trial that prior to rendering that initial opinion, he had reviewed the accident report, talked to the officer who prepared the report, gone to the scene and prepared a survey of the scene, and reviewed the repair bill and salvage bill for the Explorer as well as photographs of the vehicle.  It is apparent, however, that even according to Hannah's own testimony, the accident report revealed nothing illuminating as to the accident itself; it merely told him "who worked the accident, who was involved and where it happened."  The officer who worked the accident had nothing of substance to add to his report, which merely recited that Ms. Davis had lost control of the vehicle while attempting to avoid another car which had moved into her lane, and that her vehicle had flipped.  The repair bill told Hannah only that the vehicle "had been involved in a very serious accident," yet that much was already known.  Hannah did prepare a "survey" of the scene; but it told him nothing more than the physical attributes of the median in the area of the accident, i.e., that it dropped off in the middle and that it measured 70 feet from the edge of the pavement on one side to the edge of the pavement on the other.  Hannah could not determine from the information before him the path of the vehicle or the point of rest of the vehicle; he could tell only that the vehicle had not traveled all the way through the median.

There is no question, in the court's view, that based on his "investigation" prior to offering his initial opinion in this case, Hannah could not possibly have validly offered a legitimate, supportable opinion as to the <u>specific</u> facts or cause of this accident.[5]  He could only have concluded that the vehicle rolled over; he could not have determined <u>specifically</u> where, and certainly not <u>why</u> that might have happened and yet he was willing to offer an opinion that the accident resulted from a defect in the Explorer.

Obviously, Hannah did have additional information before him prior to testifying at trial, including the WLBT videotape and photographs pulled from the videotape, and the testimony of the eyewitnesses.  The latter, however, he disregarded entirely, as inconsistent with his perception of the physical evidence, i.e., the videotape and photographs.  That left only the photographs and videotape to inform him as to the cause of the accident.  And yet it is manifest that this evidence is, at worst, inconsistent with his conclusion, and at best, fails to yield sufficient information from which he could form a conclusion to a reasonable degree of probability.

---

[5]     Medcalf, in fact, testified that without the photographs from the videotape, there was "no firm evidence" as to whether the accident was the result of a friction trip, as he contended, or a mechanical trip, as Ford maintains.

For his part, Medcalf ultimately testified that he is not an accident reconstructionist and he thus deferred to Hannah's reconstruction of the accident, though Medcalf did himself undertake to determine where and how the vehicle rolled over. Medcalf testified that if the rollover sequence had begun on the roadway, as was his theory, he would have expected to see heavy tire marks on the roadway where the vehicle went off; yet there was no evidence of tire marks on the roadway. Thus, his sole basis for concluding that the rollover began on the roadway was the fact that there was only one strong tire mark extending into the grass. The only evidence as to the tire mark(s), however, was the videotape and the photographs taken from the videotape. Medcalf testified that he could not tell much from the copy of the videotape he was originally provided by plaintiffs' counsel, and that in fact, the still photographs his subcontracters pulled from the WLBT videotape were "so dark we couldn't see much." He thus "lightened it up to be able to see what we could find . . . ." And all he could find, he reported, was the single strong tire mark. Medcalf agreed, though, that when a videotape is copied, it loses some of its integrity, and does not provide as much detail as the original would. Further, he agreed that when you take a photograph off a videotape, it changes the information, or the formatting of the information, so that you may lose even more detail. He agreed, moreover, that when you lighten up such a

19

photograph, while you may "bring up detail in the dark areas," at the same time, you "lose a little detail in the lighter areas," so that some detail, such as lighter tire marks, may be more difficult to see.[6]

In sum, then, the simple fact is, both Hannah's and Medcalf's opinion that the rollover sequence was beginning, and that the vehicle was leaning and/or becoming airborne as it left the roadway, was ultimately based on their claimed perception that there was but a single distinct tire mark in the grass leading from the roadway into the median.  Neither of these witnesses was able to view the scene at or near the time of the accident, and no still photographs were taken of the scene.  The only physical evidence of the scene was the videotape taken by WLBT and the photographs pulled from the videotape, but all who viewed the photographs agreed that they are grainy and dark, making it difficult to discern much in the way of detail.  And yet, still, despite the poor quality of the photographs pulled from the videotape (as well as the poor quality of the copy of the

_____

[6]     The court notes that whereas Hannah had concluded the vehicle was becoming airborne on the roadway because he could only see evidence of a single distinct tire mark in the grass coming off the median, and two other very faint tire marks and no evidence of the fourth tire on the grass, Medcalf testified that he could see only a single distinct tire mark, one faint tire mark and no other marks.  The point is simply that, beyond their impression that the photographs, which both admit are of poor quality, show only a single strong tire mark, even plaintiffs' experts do not agree as to what the photographs show.

videotape entered in evidence), which may make it somewhat difficult to discern details of the scene, and of the tire tracks in particular, the tracks are nonetheless quite discernible on these photographs.  That is, even though the quality of those photographs is rather poor, the photographs clearly reveal two tire marks leading through to near the center of the median. Moreover, one is not left to rely solely on the photographs to prove this point:  the presence of two distinct tire tracks leading off the interstate and down into the bottom of the median is clear and unmistakable from the original videotape, notwithstanding plaintiffs' experts' refusal to acknowledge as much.

What is perhaps even more clear, though, is the fact that even if one could not conclude with assurance from the photographs that the Davis vehicle was on all four tires as it left the roadway, it is certainly not possible to conclude from the photographs that it was <u>not</u> on all four wheels when it entered the median.

A mere scintilla of evidence is all that supports Hannah's and Medcalf's conclusions as to how the subject accident occurred, and that is insufficient to support a jury verdict; but "[e]ven if the evidence is more than a scintilla, [the applicable Fifth Circuit standard] assumes that some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield to a directed verdict."  <u>Cheney v. U.S. Oncology, Inc.</u>, 2002

21

WL 663705, at *1 (5th Cir. 2002).  That is the case here.  The premise of Medcalf's causation opinion is that the rollover began on the pavement; the evidence is overwhelmingly to the contrary. For that reason, the court concludes that Ford is entitled to judgment as a matter of law, for plaintiffs' claim fails without proof <u>by a preponderance of the evidence</u> that the accident and resulting injuries were caused by the alleged defect in the vehicle.[7]

Accordingly, for the foregoing reasons, it is ordered that Ford's renewed motion for judgment as a matter of law is granted.[8]

SO ORDERED this 11th day of January, 2006.


/s/ Tom S. Lee
UNITED STATES DISTRICT JUDGE

---

[7]     It is, of course, apparent in view of the court's conclusion that Medcalf has not only failed to demonstrate causation but has failed to establish a feasible alternative design that would not have rolled over under the circumstances of the Davis accident.

[8]     Rule 50(c)(1) states:
If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial.  If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.
If the court were not convinced that Ford is entitled to judgment as a matter of law, it would order a new trial on liability and damages on the basis that the jury's verdict is against the overwhelming weight of the evidence.